NOT DESIGNATED FOR PUBLICATION

No. 125,755

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BOARD OF COUNTY COMMISSIONERS OF
JOHNSON COUNTY, KANSAS,
*Appellant*,

v.

DOUG JORGENSEN,
STATE FIRE MARSHALL,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held September 20, 2023. Opinion filed March 8, 2024. Affirmed.

*Robert A. Ford*, assistant county counselor, of Olathe, for appellant.

*Dwight R. Carswell*, deputy solicitor general, *Anthony J. Powell*, solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ATCHESON, P.J., ISHERWOOD and HURST, JJ.

PER CURIAM: Six years ago, the State Fire Marshal's office issued citations for fire code violations to two group homes for developmentally impaired adults operated under the auspices of a Johnson County social service agency. The Fire Marshal considered the homes to be care facilities requiring protective devices they didn't have. Johnson County pushed back. Since then, the dispute—pitting the Johnson County Board of Commissioners against State Fire Marshal Doug Jorgensen—has evolved into a legal tussle having little to do with the particular citations and a great deal to do with how

1

those group homes and about two dozen others like them in Johnson County may be regulated.

Johnson County has argued the group homes should not be treated as care facilities regulated under the Kansas Fire Safety and Prevention Act (state fire code), K.S.A. 31-132 et seq., so the safety features the Fire Marshal found lacking would be unnecessary. In addition, Johnson County requested what it has characterized as a reasonable accommodation under the federal Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., that would excuse compliance with the state fire code. The Fire Marshal denied the request. The district court upheld the Fire Marshal's position, as do we.

*Introduction*

The Fire Marshal's citations and the denial of the requested accommodations are agency actions that made their way to the Johnson County District Court and now to us under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. The KJRA limits judicial correction of agency actions to several statutory bases and typically confines factual review to the agency record. See K.S.A. 77-619(a) (limitations on supplementing agency record); K.S.A. 77-621(c) (grounds for granting judicial relief from agency action). As the party challenging the agency action, Johnson County bears the burden of proving a correctable error. K.S.A. 77-621(a)(1); *Blue Valley Tele-Communications, Inc. v. Kansas Corporation Comm'n*, 63 Kan. App. 2d 381, 390, 528 P.3d 1054 (2023). Under the KJRA, we consider an appeal from the district court as if the petition for review of the agency action had been originally filed with us. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); *Yeasin v. University of Kansas*, 51 Kan. App. 2d 939, 947, 360 P.3d 423 (2015). In other words, we effectively disregard the district court's decision-making and review the points presented on appeal without deference.

2

In an earlier appeal, this court concluded it lacked jurisdiction because the district court had not addressed an equal protection claim Johnson County raised in its petition for review, rendering the ruling otherwise denying relief to Johnson County interlocutory. *Board of Johnson County Comm'rs v. Jorgensen*, No. 122,244, 2021 WL 2283036, at *6 (Kan. App. 2021) (unpublished opinion). The panel dismissed the appeal. Johnson County then dropped the equal protection claim, and the district court reiterated its denial of relief—the decision now before us. The parties are, of course, familiar with the background circumstances outlined in *Jorgensen*, and we do not repeat those details here.

But, like our colleagues in *Jorgensen*, we feel as if we are operating in a factual twilight given the abbreviated administrative record. We typically review adjudicatory proceedings under the KJRA, such as workers compensation claims or property tax appeals, in which evidence is presented to agency decision-makers who then issue determinations composed in some manner of factual findings and legal conclusions. Here, we have the citations, but the balance of the record consists mostly of correspondence and other communications between Johnson County managers and Fire Marshal Jorgensen or more commonly their respective legal representatives. Accordingly, we lack a cohesive overview of the circumstances of the sort that might be readily drawn from a well-developed evidentiary hearing augmented with the parties' written submissions to the agency decision-maker and a resulting order.

We have necessarily gleaned information from a disjointed and episodic administrative record, matters of agreement in the legal papers and briefing submitted to the district court and to us, and oral argument on one key point. At oral argument, the lawyers for both Johnson County and the Fire Marshal agreed the issue on appeal is confined to the request that the group homes be excused from complying with the state fire code. If the request were granted, the two citations would be invalidated, and the Fire Marshal would no longer have authority to regulate the group homes—leaving fire safety standards to county and municipal codes alone.

3

One of the cited group homes is in Olathe, and the other is in Gardner. We gather they are typical of about 25 to 30 such residences in Johnson County. The group homes are what would be considered single-family structures in neighborhoods zoned for residential uses. Four or five developmentally impaired adults live in each home. Some of the residents also may have physical limitations. The residents would be unable to live independently, although the degree of impairment varies from person to person. We have no information about the range of impairments generally or the impairments of the residents in the two group homes when they were cited. We infer each of the two dozen or so group homes is staffed 24 hours a day by at least one Johnson County employee or contractor.

We similarly infer that most or all of the houses are privately owned. The residents stay for extended periods of time and pay rent. The residents of a particular home are not related by blood or marriage, although they may prepare meals and eat together and engage in some other communal activities. Johnson County Developmental Supports (JCDS), a county agency, oversees and coordinates the operation of the group homes.

*Exemption from State Fire Code Under K.S.A. 31-133*

Under the state fire code, if four or more individuals with disabilities live in a place where they receive some care, the building is considered a "residential board and care occupancy home." See K.S.A. 31-133(a) (state fire marshal "shall adopt reasonable rules and regulations"); K.A.R. 22-1-3(q) (adopting 2006 version of Life Safety Code, as promulgated by National Fire Protection Association); Life Safety Code § 3.3.168.12 (2006 ed.) (defining "residential board and care occupancy" as "[a] building . . . used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services"). The state fire code, in turn, requires those facilities to have fire prevention and related safety features not usually found in single-family homes, such as panic bars on exit doors, fire retardant

4

interior doors, interconnected smoke alarms, and sometimes sprinkler systems. Neither of the cited group homes was fully compliant with requirements identified in the citations, and Johnson County has suggested compliance could be sufficiently expensive to prompt owners to withdraw the residences from the JCDS program.

But the governing statute exempts "buildings used wholly as dwelling houses containing no more than two families" from those requirements. K.S.A. 31-133(a)(3), (4). Johnson County argues the group homes qualify for the exemption because the residents should be treated as a family. Likewise, Johnson County points out that a congregate living arrangement for three disabled persons would not be considered a residential board and care occupancy facility and contends there is no meaningful difference between the group homes the JCDS oversees—for four or five residents—and such an arrangement. Accordingly, under the KJRA, Johnson County has attacked the State Fire Marshal's denial of an exemption as beyond the office's jurisdiction and as an erroneous interpretation or application of the controlling law. See K.S.A. 77-621(c)(2), (4). We fail to see any appreciable legal difference in the challenges on those grounds. Given Johnson County's argument, it also seems to characterize the denial as "otherwise unreasonable or arbitrary," another basis for setting aside an agency action. See K.S.A. 77-621(c)(8). We are constrained to disagree with Johnson County's position.

As to the number of residents triggering the board and care designation, the regulation reflects an exercise in line-drawing common to statutes and administrative rules that set precise numerical requirements or standards in outlining governing public policies. In their precision, those requirements tamp down arguments about when they apply—eliminating a common battlefield over the scope of more generally crafted regulatory language. See *United States Dept. of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 780, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989) (recognizing "standard virtues of bright-line rules" include avoiding "the difficulties attendant to ad hoc adjudication"); *Mary V. Harris Foundation v. F.C.C.*, 776 F.3d 21, 28

5

(D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule consistently in order both to preserve incentives for compliance and to realize the benefits of easy administration that the rule was designed to achieve."). But that kind of line-drawing almost inevitably leaves small differences between cases resting close to though on opposite sides of the line. See *Klein v. Board of Supervisors*, 282 U.S. 19, 23, 51 S. Ct. 15, 75 L. Ed. 140 (1930) ("Thus we come to the usual question of degree and of drawing a line where no important distinction can be seen between the nearest point on the two sides, but where the distinction between the extremes is plain."); *State v. Brown*, 46 Kan. App. 2d 210, 216-17, 262 P.3d 1055 (2011) (Atcheson, J., dissenting).

Courts, however, defer to legislative or executive decision-making in crafting those kinds of statutory and regulatory standards and the concomitant public policies they advance. See *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 4, 374 P.3d 680 (2016) ("Questions of public policy are for legislative and not judicial determination, and where the legislature declares a policy, and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for that body and not for the courts."); *State v. Baumgarner*, 59 Kan. App. 2d 330, 335, 481 P.3d 170 (2021) ("We do not have the prerogative to recraft a statute to suit our view of tidy drafting or good public policy."). We yield here. Could the applicable regulation have reasonably defined board and care facilities as those with three residents or six or nine? We suppose. And then almost inevitably somebody would contend they were aggrieved because their group home accommodated one more resident than the regulatory definition.

Johnson County has not shown that the four-person standard adopted in the state fire code is wholly unreasonable or irrational. Rather, Johnson County asserts that it is unfair to apply the regulation to the group homes JCDS manages simply because they fall just over the line and are, therefore, regulated. But that perceived unfairness does not invite judicial relief. Indeed, granting relief would undo the legislative or administrative design and spawn repetitive litigation over how much of a variance from a defined

6

standard might be permitted in the name of some amorphas measure of "fairness." The courts should not be in that business, especially with respect to regulatory provisions aimed at public health and safety.

Johnson County's argument premised on the meaning of the word "families" in K.S.A. 31-133(a)(3) and (a)(4) fares no better. Johnson County contends the residents of a given group home should be considered a family for purposes of the fire prevention statutes and regulations.

Neither the relevant statutes nor the relevant regulations define "family." The 2006 version of the Life Safety Code the State Fire Marshal has adopted as a component of the Kansas regulations explicitly declines to define "family." Life Safety Code § A.24.1.1.1. We, therefore, should look to standard dictionaries for that purpose. See *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017). A "family" may be "a social unit consisting of parents and the children they rear" or "one's spouse and children" or "a group of people related by ancestry or marriage; relatives." Webster's New World College Dictionary 523 (meanings 2, 3) (5th ed. 2018). Similarly, Black's Law Dictionary 747 (11th ed. 2019) defines "family" as "[a] group of persons connected by blood, by affinity, or by law, esp. within two or three generations." There are other definitions that are less apt or obviously inappropriate. The word may refer to "a criminal syndicate under a single leader." Webster's New World College Dictionary 523 (meaning 5). That dictionary also includes as an obsolete definition "all the people living in the same house"—a sense in which the word "is no longer used at all." Webster's New World College Dictionary 523 (meaning 1 of "family"); New World College Dictionary xx (dictionary's explanation of "obsolete" as usage label). The Kansas appellate courts have embraced the usual meaning of "family" to be persons united by blood or marriage. See *In re Dittemore's Estate*, 152 Kan. 574, 577, 106 P.2d 1056 (1940); *In re Marriage of Gerelman*, 56 Kan. App. 2d 357, 364, 430 P.3d 467 (2018); see

7

also 1 Elrod, Kansas Law and Practice: Kansas Family Law § 4:1 (2022 ed.) ("Family historically has been defined by biology or marriage.").

We have no reason to conclude the Legislature intended something other than the customary definition of family in K.S.A. 31-133, meaning persons related by blood or marriage. That conclusion effectively undercuts Johnson County's position. Moreover, based on this record, the residents of the group homes are far more like boarders than family members. They have no affinity apart from living in the same dwelling structure. Each of them pays rent and resides there for an indefinite time. While the residents may participate in communal endeavors such as meal preparation and some recreational activities, the record doesn't suggest they necessarily forge deep and lasting bonds characteristic of siblings or other blood relatives.

Johnson County cites and quotes from commentary in the 2021 version of the Life Safety Code, as drafted by the National Fire Protection Association, that "'[a] group of nonrelatives living together in a nontraditional group can be the "functional equivalent" of a more traditional family unit'"—an equivalence that would consider whether the residents share the entire dwelling other than bedrooms and the group "'lives, cooks, and functions together as a housekeeping unit.'" (Quoting Life Safety Code § A.24.1.1.2 [2021 ed.].) The observation, though interesting, is unavailing. First, of course, the 2021 edition of the Life Safety Code is neither statutory nor regulatory law in Kansas and has no more force than any other treatise or secondary source. It simply suggests some congregate living situations may mimic aspects of families residing in dwellings typically thought of as single-family residences in contrast to rooming houses for purposes of fire safety regulation. And those similarities may guide how some of the regulations outlined in the 2021 Life Safety Code ought to be applied.

More particularly, however, the recent commentary doesn't purport to define what constitutes a "family" or "families," the actual terminology used in the exemptions in

8

K.S.A. 31-133(a)(3) and (a)(4). Nor does it presume to construe those specific exemptions. Expanding or otherwise redefining the exemptions is up to the Legislature. And unless or until the Legislature does so, we are obligated to apply what is now written in the statute.

Johnson County's argument fails on a second front, as well. The group homes are subject to enhanced fire prevention and safety regulations because the residents have measurable intellectual limitations and, in some instances, physical impairments. That's why they live in one of the county-managed residences. As we have indicated, the record is noticeably silent on the nature of the residents' conditions and the extent of care they receive. Across the group homes, we may infer there are more than 100 residents, presumably with some range of required assistance. And we don't know if residents with greater or otherwise similar needs are grouped together. Those unknowns contribute to a record that fails to show that the residents of a given home replicate a family-like unit with a mix of adults and children who collectively can respond quickly and safely to a fire emergency.

Johnson County has not met its burden under the KJRA to demonstrate that the Fire Marshal's decision that the group homes should be subject to the state fire code is erroneous in a way outlined in K.S.A. 77-621(c).

Throughout these proceedings, Johnson County has sought a ruling that the state fire code should not apply to the group homes. Under K.S.A. 31-136, the Fire Marshal may authorize "exemptions" from "specific requirements" of the fire code to avert an "unnecessary hardship." The Fire Marshall could, in appropriate circumstances, waive a fire code mandate for a sprinkler system in a specific building upon weighing competing concerns presumably rooted in cost and inconvenience of compliance versus the use of the structure and safety for the public generally and for persons working or living there.

9

As we understand this case, Johnson County has not sought a statutory exemption for any specific safety upgrades identified in the citations issued to the two group homes.

*Reasonable Accommodation under FHA*

Johnson County also contends its request that the group homes be exempt from the state fire code constitutes a reasonable accommodation under the federal FHA and the denial of that request amounts to unlawful disability discrimination. Again, we are constrained to disagree.

The FHA broadly prohibits discrimination in housing. In 1988, the FHA was amended to include "handicap" as a protected characteristic and to preclude "the refusal to make reasonable accommodations in rules, policies, practices, or services" that would permit a handicapped person the "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). For purposes of this appeal, we do not understand there to be any dispute that the FHA applies to the State Fire Marshal as a governmental actor and to the operations of his office. Likewise, the residents of the group homes qualify as handicapped persons entitled to the protections of the FHA. And we assume the state fire code affects in some manner the use and enjoyment of the dwellings. As the briefing suggests and the lawyers for the parties assured us during oral argument, the legal dispute before us under the FHA focuses on whether Johnson County's request that the group homes be exempted from the state fire code constitutes a reasonable accommodation. The legal propriety of the Fire Marshal's denial rises or falls on that determination.

Taking the issue as the parties have narrowly framed it, we turn to that question. The provisions in the FHA barring handicap discrimination and permitting reasonable accommodations to relax certain restrictions that otherwise would inhibit handicapped individuals in securing housing have legal roots in the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and closely parallel protections in the Americans With Disabilities

10

Act, 42 U.S.C. § 12101 et seq. Cases construing those statutory schemes are highly persuasive in considering disability discrimination claims under the FHA, particularly involving reasonable accommodations. *Davis v. Echo Valley Condominium Association*, 945 F.3d 483, 491 (6th Cir. 2019) (persuasive value of Rehabilitation Act authority in FHA claims); *Geraci v. Union Square Condominium Association*, 891 F.3d 274, 277 & n.1 (7th Cir. 2018) (legal similarity of failure to accommodate claims under FHA and ADA); *Providence Behavioral Health v. Grant Road Public Utility District*, 902 F.3d 448, 454-55 & n.2, 459 (5th Cir. 2018) (recognizing comparability of reasonable accommodation claims under ADA and FHA and deciding plaintiff's claims in tandem).

Here, Johnson County effectively sought to have more than two dozen group homes excluded from coverage under the state statutory fire code and the related regulations—an expansive and detailed set of standards for the safety of buildings used as residences, workplaces, or commercial enterprises. Johnson County's position suffers from a fundamental flaw:  A blanket exclusion from an exhaustive regulatory scheme does not constitute a reasonable accommodation under the FHA. Rather, an appropriate accommodation entails a much more tailored and targeted modification of specific regulatory requirements permitting a particular handicapped person or a limited group of similarly situated persons to take advantage of a housing opportunity. *Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019). An actionable claim under the FHA, in turn, requires "a request for a specific accommodation that is both reasonable and necessary to allow the handicapped individual an equal opportunity to use and enjoy the particular housing, and the defendant's refusal to make the requested accommodation." 940 F.3d at 139. A "reasonable accommodation" under the FHA has similarly been described as "a moderate adjustment to a challenged policy, not a fundamental change in the policy." *Davis*, 945 F.3d at 490; see also *Giebler v. M & B Associates*, 343 F.3d 1143, 1157 (9th Cir. 2003) (reasonable accommodation under FHA imposes neither "fundamental alteration in" challenged policy or "undue financial or administrative burdens" on accommodating party).

11

The United States Supreme Court made this point in construing the Rehabilitation Act of 1973 as precluding accommodations that would work a "'fundamental alteration'" in a program and upset the "balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests [of covered entities] in preserving the integrity of their programs." *Alexander v. Choate*, 469 U.S. 287, 300, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S. Ct. 2361, 60 L. Ed. 2d 980 [1979]). A governmental agency, therefore, "need not . . . make 'fundamental' or 'substantial' modifications to accommodate the handicapped," although "it may be required to make 'reasonable' ones." 469 U.S. at 300 (quoting *Davis*, 442 U.S. at 410). This construction of the Rehabilitation Act obviously has been imported into the analysis of reasonable accommodation claims under the FHA.

Here, Johnson County's sweeping request that all of the group homes (and their residents) be excluded from the state fire code is the antithesis of a reasonable accommodation since it cannot be characterized as a mere modification or adjustment. By its very nature, a requested exclusion of that magnitude amounts to a fundamental alteration of the legal relationship created through the regulatory scheme.

Moreover, as the First Circuit Court of Appeals recognized in *Summers*, courts must be attentive to implications a requested accommodation may have on public safety goals underpinning the regulations or policies. 940 F.3d at 140 ("That a requested accommodation poses a threat to public safety has obvious relevance to the reasonableness of the accommodation."). Safety considerations—particularly for the residents of the group homes—get short shrift in Johnson County's pitch for the legal sufficiency of its requested accommodation. The residents require a measure of supervision and assistance with at least some activities of daily living. As we have said, we may assume the degree of supervision and assistance varies among the residents. And the Life Safety Code's enhanced fire suppression and protection requirements are

12

intended to enhance the safety of the residents. Johnson County, however, has neither explained nor presented evidence as to why those enhancements would be unnecessary or that any local regulation of the group homes would afford similar or at least minimally sufficient protections for the residents, given their limitations.

In sum, we find Johnson County's request for a categorical exemption from the state fire code does not constitute a reasonable accommodation under the FHA. The district court, therefore, ruled correctly in finding the Fire Marshal did not violate the FHA by denying the request. But what we have said about the requested accommodation should not be extrapolated beyond the circumstances presented to us.

Reasonable accommodation requests under the FHA and claims based on denials of those requests are by their very nature heavily fact-bound. *Summers*, 940 F.3d at 139; *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016); *Fair Housing Center of Metropolitan Detroit v. Singh Senior Living LLC*, ___ F. Supp. 3d ___, 2023 WL 8238964, at *5 (E.D. Mich. 2023). We, therefore, should not be understood to hold that a request to be exempted from a regulation or policy or even a set of regulations or policies invariably would fail as a reasonable accommodation. The determination would depend upon the contours of accommodation balanced against the scope, purpose, and particularized impact of the regulation or policy on the person or persons seeking relief.

In that vein, the lawyer representing the Fire Marshal informed us during oral argument that the Fire Marshal has no interest in now enforcing the two citations since they were issued so long ago. We cannot and do not offer an opinion on what might be a reasonable accommodation under the FHA as to any specific safety requirements or some future citation.

Independently of a request for a reasonable accommodation, a person may challenge a broad policy or regulation under the FHA on the grounds its requirements,

13

though facially neutral, have a disparate impact on handicapped persons' access to housing. A disparate impact claim challenging the systemic application of a policy is analytically different from a request for a reasonable accommodation under a policy, and the two trigger markedly varied proofs to establish an FHA violation. See *Payan v. Los Angeles Community College District*, 11 F.4th 729, 738 (9th Cir. 2021) (In construing the ADA, the court stated: "The important difference between these two theories is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility.").

A disparate impact claim requires the complaining party to initially show, typically with statistical analyses and other complementary evidence, that a regulation or policy disproportionately disadvantages members of the protected class (such as handicapped persons). That showing casts a burden of production on the responding party to demonstrate a legally sufficient nondiscriminatory and beneficial reason for the regulation. Clearing that hurdle then shifts the ultimate burden of persuasion back to the complainant to point to an alternative practice that would be less discriminatory but would still efficiently and effectively further the positive objectives of the challenged regulation. *Reyes v. Waples Mobile Home Park Limited Partnership*, 91 F.4th 270, 276 (4th Cir. 2024); *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*, 17 F.4th 950, 960-62 (9th Cir. 2021); see *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 540-42, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015) (recognizing disparate impact claims under FHA and outlining proofs, especially of prima facie case).

On appeal, Johnson County does not purport to be pursuing a disparate impact claim, so we do not delve deeper into the rigorous evidentiary burden of proof for them. Similarly, Johnson County is not asserting a disparate treatment claim that would be

14

grounded in an actual intent to discriminate based on handicap status—the third way of violating the FHA. *Reyes*, 91 F.4th at 274 (distinguishing disparate treatment claims under FHA from disparate impact claims); *Southwest Fair Housing Council, Inc.*, 17 F.4th at 972-73; *Summers*, 940 F.3d at 138-39 (three theories of liability under FHA: disparate treatment, disparate impact, and denial of reasonable accommodation).

Having considered the points the parties have presented to us, we conclude Johnson County has not established that the State Fire Marshal undertook an improper agency action. The district court, therefore, properly denied relief.

Affirmed.